**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                        )
**GREINER ORTHOPEDICS, LLC et al.,**    )
                                        )
    **Plaintiffs,**  )
                                        )
      **v.**  )
                                        )   **Case No. 23-cv-01047 (APM)**
**ROBERT F. KENNEDY JR.,**[1]           )
*in his official capacity as Secretary of Health*  )
*and Human Services*, **et al.,**       )
                                        )
    **Defendants.**  )
_____ )

**<u>MEMORANDUM OPINION</u>**

**I.       INTRODUCTION**

      Plaintiff StimLabs, LLC ("StimLabs") is a biotechnology company that manufactures, markets, and distributes human cells, tissues, and cellular and tissue-based products, or HCT/Ps. Plaintiffs Greiner Orthopedics, LLC ("Greiner"); Steindler Orthopedic Clinic ("Steindler"); Anesthesia and Pain Consultants, PC ("APC"); and Macomb Foot, Ankle & Wound Care ("Macomb") are providers of Ascent and Corplex P, two HCT/Ps manufactured by StimLabs. Together, Plaintiffs challenge the lawfulness of two Technical Direction Letters ("TDLs") issued in February 2022 by Defendants the Secretary of Health and Human Services ("Secretary") and the Administrator of the Center for Medicare and Medicaid Services ("CMS") that automatically denied Medicare coverage and reimbursement for HCT/Ps, including Ascent and Corplex P. Plaintiffs argue that these TDLs (1) comprised a substantive change in law triggering the Medicare notice-and-comment rulemaking requirement; (2) were applied retroactively, contrary to law; and

---

[1] Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, the court substitutes the current Secretary of Health and Human Services as the defendant in this case.

(3) are arbitrary and capricious under the Administrative Procedure Act ("APA").  And despite the rescission of these two TDLs by a third TDL issued in March 2022, Plaintiffs maintain that Defendants continue to apply *sub silentio* the policies of the first two TDLs.  Plaintiffs Greiner, Steindler, APC, and Macomb also challenge final decisions by the Secretary denying Medicare coverage and reimbursement for specific instances of the use of Ascent as arbitrary and capricious and unsupported by substantial evidence.  The parties have filed competing cross-motions for summary judgment.

For the reasons that follow, Plaintiffs' Motion for Summary Judgment and Declarative Relief, ECF No. 26, is denied, and Defendants' Cross-Motion for Summary Judgment, ECF No. 29, is granted.

## II.    BACKGROUND

Much of the statutory framework and factual background in this case regarding the Medicare reimbursement program, coverage of HCT/Ps, and the 2022 TDLs have already been set forth in *StimLabs, LLC v. Becerra* (*StimLabs I*), 636 F. Supp. 3d 165 (D.D.C. 2022); *see also Row 1 Inc. v. Becerra*, No. 22-cv-718, 2023 WL 183687 (D.D.C. Jan. 12, 2023), *aff'd*, 92 F.4th 1138 (D.C. Cir. 2024).  The court here incorporates those facts by reference and supplements them with additional facts specific to this case.

### A.    Regulation of Ascent and Corplex P

Ascent is an HCT/P derived from human amniotic fluid and delivered via injection.  Pls.' Mem. of P. & A. in Supp. of Pls.' Mot. for Summ. J. & Injunctive & Declaratory Relief, ECF No. 26 [hereinafter Pls.' Mot.], at 7; J.A., ECF. No. 38, at 228.  It is intended for homologous use, which means that it "performs the same basic function or functions in the recipient as it did in

the donor." Pls.' Mot. at 6. Ascent is not a stem cell product, exosome product, or tissue product. J.A. at 153.

Corplex P is an HCT/P derived from human umbilical cord. Pls.' Mot. at 8. It is also intended for homologous use. *Id.* Corplex P is not an exosome product. *Id.*

HCT/Ps are regulated under a unique regulatory scheme. Section 361 of the Public Health Service Act gives the FDA broad authority to issue regulations to prevent the transmission of communicable diseases. *See* 42 U.S.C. § 264(a). Because HCT/Ps pose the risk of transmitting infectious disease, the FDA has invoked its Section 361 authority to regulate HCT/Ps under that provision. *See* Human Cells, Tissues, and Cellular and Tissue-Based Products; Establishment Registration and Licensing, 66 Fed. Reg. 5447, 5449 (Jan. 19, 2001). Pursuant to that authority, the FDA determined that certain HCT/Ps could be "effectively regulated solely by controlling the infectious disease risks they present," rather than with the pre-market review and approval typically required for other products. *Id.* HCT/Ps can be regulated under Section 361 if they, as relevant here, (1) are minimally manipulated; (2) are intended for homologous use only; (3) are manufactured without combination with another article, with exceptions; and (4) do not have a systemic effect and are not dependent on metabolic activity of living cells. 21 C.F.R. § 1271.10(a) (2004). Manufacturers of HCT/Ps meeting these criteria are required only to comply with certain registration and reporting regulations. 66 Fed. Reg. at 5449. HCT/Ps that do not meet these criteria are regulated as drugs, devices, or biological products under Section 351 of the Public Health Service Act, which requires the more onerous burden of pre-market FDA review and approval. *Id.*

The FDA occasionally publishes guidance and consumer alerts related to HCT/Ps. As relevant here, on July 22, 2020, the FDA issued a consumer alert advising that "[a]nyone considering the use of anything purported to be a regenerative medicine product, including stem

cell products, exosome products, or other widely promoted products such as products derived from adipose tissue . . . , human umbilical cord blood, Wharton's Jelly, or amniotic fluid should know" that "[n]one of these products have been approved for the treatment of any orthopedic condition, such as osteoarthritis, tendonitis, disc disease, tennis elbow, back pain, hip pain, knee pain, neck pain, or shoulder pain." *Consumer Alert on Regenerative Medicine Products Including Stem Cells and Exosomes*, U.S. FDA (July 22, 2020), https://www.fda.gov/vaccines-blood-biologics/consumers-biologics/consumer-alert-regenerative-medicine-products-including-stem-cells-and-exosomes [hereinafter July 2020 Consumer Alert].

StimLabs determined that Ascent and Corplex P satisfied the criteria to be regulated as Section 361 products and began to market Ascent in 2017. Pls.' Mot. at 10–11. It maintained this assessment even after the FDA updated its interpretation of the criteria in 2019. *Id.* at 12–13. In 2021, StimLabs suspended the manufacture and sale of Ascent as a Section 361 product to instead pursue pre-market FDA approval under Section 351, "[s]olely as a business decision." *Id.* at 13. Throughout this time, StimLabs was never subject to any adverse action by the FDA with respect to the manufacture and sale of Ascent or Corplex P. *Id.* at 11.

## B.    Medicare's "Reasonable and Necessary" Standard

The Medicare statute provides that "no payment may be made . . . for any expenses incurred for items or services . . . which . . . are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." 42 U.S.C. § 1395y(a)(1)(A); *see also* 42 C.F.R. § 411.15(k)(1) (1990). The Secretary has broad authority to carry out this directive. "The Secretary's decision as to whether a particular medical service is 'reasonable and necessary' and the means by which she implements her decision, whether by promulgating a generally applicable rule or by allowing individual adjudication, are clearly

discretionary decisions." *Heckler v. Ringer*, 466 U.S. 602, 617 (1984); *see also Kort v. Burwell*, 209 F. Supp. 3d 98, 110 (D.D.C. 2016) ("[T]he phrase 'reasonable and necessary' . . . has the effect of vesting substantial authority in the Secretary.").

The Secretary may articulate what is "reasonable and necessary" through regulations promulgated through notice-and-comment rulemaking, *see* 42 U.S.C. § 1395hh, or through National Coverage Determinations ("NCDs") setting forth whether any particular item or service is covered by Medicare nationally, *see* 42 U.S.C. § 1395ff(a)(1). The standard may also be articulated through Local Coverage Determinations ("LCDs") adopted by Medicare Administrative Contractors, or MACs, the private entities with which CMS contracts to administer the Medicare program. 42 U.S.C. § 1395ff(f)(2)(B).

In the absence of a final rule, NCD, or LCD, MACs must make individual determinations as to whether the services provided to a specific beneficiary were reasonable and necessary. Medicare Program: Review of National Coverage Determinations and Local Coverage Determinations, 68 Fed. Reg. 63692, 63693 (Nov. 7, 2003) ("In circumstances when there is no published policy on a particular topic, decisions are made based on the individual's factual situation."). MACs make these individual determinations based on criteria set forth in the Medicare Program Integrity Manual ("MPIM"):

> In the absence of an NCD, Medicare contractors are responsible for determining whether services are reasonable and necessary. If no local coverage determination (LCD) exists for a particular item or service, the MACs . . . shall consider an item or service to be reasonable and necessary if the item or service meets the following criteria:
> - It is safe and effective;
> - It is not experimental or investigational; and
> - It is appropriate, including the duration and frequency in terms of whether the service or item is:
>   - Furnished in accordance with accepted standards of medical practice for the diagnosis or treatment

> > of the beneficiary's condition or to improve the
> > function of a malformed body member;
> > o  Furnished in a setting appropriate to the beneficiary's
> > medical needs and condition;
> > o  Ordered and furnished by qualified personnel; and,
> > o  One that meets, but does not exceed, the beneficiary's
> > medical need.

MPIM § 3.6.2.2.  MACs must deny any item or service that is not "reasonable and necessary."  *Id.*
§ 3.6.2.1.

There is no final rule, NCD, or LCD with respect to Medicare coverage and reimbursement
of HCT/Ps.  *See* J.A. at 62, 289, 628; Defs.' Mem. of P. & A. in Supp. of Defs.' Cross-Mot. for
Summ. J. & Opp'n to Pls.' Mot., ECF No. 29 [hereinafter Defs.' Mot.], at 16; Pls.' Mot. at 4, 16.

### C.    Procedural History

In 2020, Greiner, Steindler, and APC began using Ascent to treat patients enrolled in
Medicare experiencing knee and shoulder osteoarthritis and knee, hip, and shoulder pain that was
not responsive to other treatment.  Pls.' Mot. at 17–18.  Macomb began using Ascent for the same
purposes in 2021.  *Id.* at 18.

Greiner, Steindler, and APC together filed 15 Medicare reimbursement claims to their
MACs for use of Ascent to treat osteoarthritis and joint pain between September 2020 and May
2021.  *See generally* J.A.  Macomb also filed Medicare reimbursement claims for use of Ascent.
Pls.' Mot. at 18.  All claims were denied as not "reasonable and necessary."  *See generally* J.A.
The denials were affirmed on redetermination, and the providers sought review before an ALJ.
Pls.' Mot. at 18.

The ALJs in all 15 appeals by Greiner, Steindler, and APC affirmed the denials of their claims.[2]  Greiner, Steindler, and APC sought review of those determinations from the Medicare Appeals Council, which ultimately failed to act within the required 90-day period under 42 C.F.R. § 405.1100(c).  *Id.* at 20.  Plaintiffs requested escalation to federal court as required in 42 C.F.R. § 405.1132 and again the Medicare Appeals Council did not respond.  *Id.*

Plaintiffs represent that, at every stage of appeal, they maintained that the denials were unfounded because (1) Ascent and Corplex P are not subject to pre-market approval by the FDA because they are Section 361 products; (2) the safety and effectiveness of Ascent and Corplex P are regulated by the registration and reporting requirements for Section 361 products and StimLabs was in compliance with them; (3) the use of Ascent and Corplex P complied with all applicable Medicare regulations; and (4) the MACs' denials of their claims were "based on a change in a substantive standard governing Medicare coverage and reimbursement that has not been published as a final regulation as required by 42 U.S.C. § 1395hh(a)(2)."  Pls.' Mot. at 18–19.

StimLabs first filed suit in federal court in July 2022 seeking a preliminary injunction as to the policies in the February 2022 TDLs.  *StimLabs I*, 636 F. Supp. 3d at 169–71; *see also StimLabs, LLC v. Becerra* (*StimLabs II*), 651 F. Supp. 3d 56 (D.D.C. 2023).  The court dismissed that case because Plaintiffs failed to administratively exhaust their claims.  *StimLabs I*, 636 F. Supp. 3d at 169; *StimLabs II*, 651 F. Supp. 3d at 59.  Then, over a year later, in April 2023, StimLabs filed the instant suit along with Greiner, Steindler, APC, and Macomb, again challenging the policies in the February 2022 TDLs, as well as the ALJs' final determinations on the 15 reimbursement claims made by Greiner, Steindler, and APC.  *See generally* Am. Compl., ECF No. 16.

---

[2] The ALJs' final determinations as to Greiner's claims begin at J.A. 42, 95, 128, 170, 209, 252, 427, 478, 524, and 555.  The ALJs' final determinations as to Steindler's clams begin at J.A. 287, 321, 355, and 391.  The ALJs' final determinations as to APC's claims begin at J.A. 626.  The Joint Appendix contains no claims by Macomb.  *See infra* Section IV.B.2.

The parties now seek summary judgment.  Plaintiffs argue that the two TDLs imposing an automatic-denial policy for HCT/Ps (1) comprised a substantive change in law triggering the Medicare notice-and-comment rulemaking requirement; (2) were applied retroactively, contrary to law; and (3) are arbitrary and capricious under the APA.  *See* Pls.' Mot. at 1–3.  They also argue that, notwithstanding the rescission of the first two TDLs by the third TDL, CMS continues to covertly apply the automatic-denial policy set forth in the first two TDLs.  *See id.* at 16.  Plaintiffs Greiner, Steindler, APC, and Macomb also challenge the 15 final decisions by the Secretary denying Medicare coverage and reimbursement for specific instances of the use of Ascent as arbitrary and capricious and unsupported by substantial evidence.  *See id.* at 37.  As to the remedy, Plaintiffs ask that the two TDLs and the 15 final decisions be declared unlawful and set aside.  Am. Compl. ¶ 13.  Plaintiffs allege, after *StimLabs I* and *II*, that they have administratively exhausted their claims.  *See* Pls.' Mot. at 22.

## III.    STANDARD OF REVIEW

When a party seeks summary judgment as to final agency action under the APA, "the district judge sits as an appellate tribunal" and "[t]he 'entire case' on review is a question of law." *Am. Biosci. Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001) (collecting cases).  Rather than decide whether there is a genuine dispute of material fact under Rule 56, the court must "determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did."  *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 90 (D.D.C. 2006) (internal quotation marks omitted).  The court's review of final agency action is limited to the administrative record, except in a few narrow instances.  *See United Student Aid Funds, Inc. v. Devos*, 237 F. Supp. 3d 1, 3–4 (D.D.C. 2017); *see also Camp v. Pitts*, 411 U.S. 138, 142 (1973)

("[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court.").

As relevant here, the court may set aside final agency action under the APA when it is arbitrary and capricious or unsupported by substantial evidence. 5 U.S.C. § 706(2)(A), (E). The arbitrary-and-capricious and unsupported-by-substantial-evidence tests are overlapping, as the distinction between them is "largely semantic." *See Ass'n of Data Processing Serv. Orgs. v. Bd. of Governors of Fed. Reserve Sys.* (*ADAPSO*), 745 F.2d 677, 684 (D.C. Cir. 1984) (collecting cases and authorities).

The "scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983). The standard requires only that "agency action be reasonable and reasonably explained," *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021), in that the agency must "examine the relevant data and articulate a satisfactory explanation for its action," *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009) (internal quotation marks omitted). In other words, the agency's decision must demonstrate a "rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43 (internal quotation marks omitted). In Medicare cases, the "tremendous complexity of the Medicare statute . . . adds to the deference which is due to the Secretary's decision." *Dist. Hosp. Partners v. Burwell*, 786 F.3d 46, 60 (D.C. Cir. 2015) (internal quotation marks omitted).

Agency action is "unsupported by substantial evidence" if it is not supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 619–20 (1966) (internal quotation marks omitted). "Substantial evidence" is "something less than the weight of the evidence." *Id.* at 620. And the

court may not displace an agency's "choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo*." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951).

## IV.  DISCUSSION

### A.    Justiciability

#### 1.    *February TDLs*

 As a threshold matter, Defendants posit that, "[t]o the extent that Plaintiffs seek to challenge the first two [TDLs], . . . that challenge is moot because CMS has rescinded the earlier instructions to its Medicare contractors in the third [TDL]." Defs.' Mot. at 36.  Plaintiffs disagree, arguing that their "challenge to the Medicare contractors'[] alleged mishandling of reimbursement claims is not moot."  Pls.' Mem. of Law in Opp'n to Defs.' Mot. & Reply Brief in Supp. of Pls.' Mot., ECF No. 33 [hereinafter Pls.' Opp'n], at 17 (quoting *Row 1*, 92 F.4th at 1145).  Both sides rely on the D.C. Circuit's decision in *Row 1 Inc. v. Becerra* to support their respective positions. *See id.*; Defs.' Reply in Supp. of Defs.' Mot., ECF No. 36 [hereinafter Defs.' Reply], at 17–19. Neither is correct.  The proper justiciability concern here is one of standing, not of mootness.

Both mootness and standing bear on whether there is a proper case or controversy before the court.  *See* U.S. Const. art. III, § 2.  Although they "are 'related concepts,' their application is measured at different times."  *Inst'l S'holder Servs. v. SEC*, 718 F. Supp. 3d 7, 18 (D.D.C. 2024) (quoting *Garden State Broad. Ltd. v. FCC*, 996 F.2d 386, 394 (D.C. Cir. 1993)).  As the Supreme Court has described, mootness is "the doctrine of standing set in a time frame:  The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)."  *U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388, 397 (1980) (internal quotation marks omitted).

In *Row 1*, the D.C. Circuit explained that the plaintiff's challenge to the two February TDLs was moot insofar as it sought a determination that the TDLs were unlawful and should be set aside. The court held that the third TDL rescinding the first two TDLs was an example of "the government's abandonment of a challenged [policy]" that "is just the sort of development that can moot an issue." *Row 1*, 92 F.4th at 1144 (quoting *Friends of Animals v. Bernhardt*, 961 F.3d 1197, 1203 (D.C. Cir. 2020)). Because the Secretary had rescinded the automatic-denial policy of the February TDLs and had not indicated he would reinstate it, the third TDL's rescission of that policy "completely and irrevocably eradicated the effects" of the alleged violations of law. *Id.* So, to the extent the plaintiff in *Row 1* sought a determination that the first two TDLs were unlawful and must be set aside, the court could not order such relief. *Id.* at 1145.

But the court so held because the third TDL was issued on March 25, 2022—several days *after* the *Row 1* plaintiff initiated its lawsuit on March 15, 2022. *See* Compl., *Row 1 v. Becerra*, No. 22-cv-718 (D.D.C.), ECF No. 1. At the time the *Row 1* plaintiff filed suit, the February TDLs were still in place. By contrast, Plaintiffs filed the instant suit in April 2023, over a year after the February TDLs were rescinded. *See generally* Am. Compl. The D.C. Circuit's decision on mootness in *Row 1* is therefore not controlling in the ways the parties contend.

Though the parties do not raise it, the court still must be satisfied that Plaintiffs have standing. *See Elec. Priv. Info. Ctr. v. FAA*, 821 F.3d 39, 41 n.2 (D.C. Cir. 2016). They do not. Plaintiffs fail to establish the existence of a case or controversy at the outset of the litigation as to their challenge to the February TDLs. *See Food & Water Watch v. U.S. Dep't of Agric.*, 1 F.4th 1112, 1117 n.3 (D.C. Cir. 2021).

Article III standing "limits the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).

11

To establish standing, the plaintiff must show for each claim that it has (1) suffered an injury in fact that is (2) fairly traceable to (or caused by) the challenged conduct of the defendant and (3) likely to be redressed by a favorable judicial decision. *Id.* (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)).  On cross-motions for summary judgment, the plaintiff must establish these elements by a preponderance of the evidence. *See Lujan*, 504 U.S. at 561; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986); *see also Otay Mesa Property, L.P. v. U.S. Dep't of the Interior*, 144 F. Supp. 3d 35, 56 (D.D.C. 2015) (applying the preponderance-of-the-evidence standard on cross-motions for summary judgment to consider the plaintiff's standing as to claims brought under the APA).

Plaintiffs have arguably established an injury in fact: their claims for reimbursement were denied. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021).  But they fail to show how their injury is fairly traceable to the February TDLs or how a favorable judicial decision could redress it.

The second element of standing requires "a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant." *Lujan*, 504 U.S. at 560 (cleaned up).  None of the ALJs' denials refer to the February TDLs or their policy of automatically denying claims for use of HCT/Ps.  Because nothing in the Joint Appendix or in Plaintiffs' briefs demonstrate that it was the February TDLs themselves that led to the reimbursement denials, Plaintiffs fail to establish causation.

The final element of standing requires that it be "'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Id.* at 561 (quoting *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 38, 43 (1976)).  The favorable decision Plaintiffs seek is a determination that the February TDLs are unlawful and that they be set aside. *See* Am. Compl.

¶ 13.  But there is nothing now for the court to redress.  Because the third TDL rescinded the February TDLs long before the initiation of this suit, the court has nothing to determine unlawful or to set aside.  *Cf. Row 1*, 92 F.4th at 1145 (finding plaintiff's challenge to the February TDLs moot because they have been rescinded).  Plaintiffs thus fail to show they have standing to challenge the two February TDLs.

> ### 2.    *Sub Silentio Policy*

Plaintiffs also lack standing as to their claim that MACs continue to apply *sub silentio* the automatic-denial policy of the first two TDLs.

Fundamentally, Plaintiffs have not given the court any reason to believe that there is such a covert policy beyond simply saying so.  Plaintiffs infer the existence and effect of such a policy by characterizing every denial as "some iteration of the TDL position that the products were experimental and not safe and effective" and arguing that, "[t]o reach these conclusions, the ALJs had to rely upon regulations that are not applicable to HCT/Ps, which further demonstrates that CMS was following the Policies outlined in the TDLs under the pretense that the denials were based on individual reasonable and necessity determinations."  Pls.' Opp'n at 17–18.  But this assertion is not borne out by the record evidence.  As discussed below, *see infra* Section IV, the ALJs did not rely on wholly inapplicable regulations to reach their decisions.  And Plaintiffs' bald assertion that they so did finds zero record support.  To the contrary, the ALJs denied the claims in detailed opinions for different reasons, specific to the uses and beneficiaries at issue and under the applicable Medicare standards and guidelines.  *See id.*  At this stage, Plaintiffs must show by a preponderance of the evidence that a *sub silentio* automatic-denial policy caused their injuries.  Because they have failed to carry that burden, Plaintiffs lack standing to maintain this claim.

### B.    Subject Matter Jurisdiction

#### 1.    *Administrative Exhaustion*

Even if Plaintiffs' *sub silentio* policy claim were justiciable, the court lacks subject matter jurisdiction to consider it because Plaintiffs have failed to administratively exhaust it.  *See Baker v. Carr*, 369 U.S. 186, 198–99 (1962).

"It is 'well established that section 405(h) of the Social Security Act (as incorporated into the Medicare Act through 42 U.S.C. § 1395ii) expressly limits the availability of general federal question jurisdiction in the Medicare context.'"  *StimLabs I*, 636 F. Supp. 3d at 172 (citation omitted).  Instead, the Medicare Act establishes a "special review system" specifically for Medicare claims that "demands the 'channeling' of virtually all legal attacks through the agency." *Shalala v. Ill. Council on Long Term Care, Inc.*, 529 U.S. 1, 8, 13 (2000).  Claims "arising under" the Medicare Act, such as claims for reimbursement, must be channeled through that administrative review system.  *Id.* at 23.  Save a few exceptions, federal judicial review of such claims is available only after agency review procedures have been exhausted.  *Council for Urological Ints. v. Sebelius*, 668 F.3d 704, 706 (D.C. Cir. 2011); *see* 42 U.S.C. § 1395ff(b)(1)(A) (providing for "judicial review of the Secretary's final decision" following an administrative hearing); *see also Row 1*, 92 F.4th at 1146 (claims of harm from procedural deficiencies that purportedly "linger in the Medicare contractors' incorrect processing of reimbursements" are "inextricably intertwined" with claims for Medicare benefits and are therefore also subject to the channeling requirement (quoting *Ringer*, 466 U.S. at 614)).

Plaintiffs have not exhausted agency review of its covert-policy challenge.  Plaintiffs do not offer much evidence or argument to the contrary.  They do not, as they did previously, concede that they have not administratively exhausted this claim and argue that an exception to the

exhaustion requirement applies. *See StimLabs I*, 636 F. Supp. 3d at 173; *Row 1*, 2023 WL 183687, at *2. Instead, they state vaguely that, at every stage of administrative appeal, they argued that the MACs' denial of the reimbursement claims were "based on a change in a substantive standard governing Medicare coverage and reimbursement that has not been published as a final regulation as required by 42 U.S.C. § 1395hh(a)(2)," Pls.' Mot. at 18–19, and conclude without more that "Plaintiffs have presented their claims and exhausted their administrative remedies," *id.* at 22. But the court can find no instance in the Joint Appendix of Plaintiffs having made the argument that CMS was covertly applying the automatic-denial policy of the two rescinded TDLs to deny Plaintiffs' reimbursements claims. The closest Plaintiffs get is an argument that the way the MACs and ALJs applied the MPIM criteria to deny their claims constitutes a change in substantive law triggering notice-and-comment rulemaking. *See, e.g.*, J.A. at 72 ("[T]he ALJ's Decision imposed substantive requirements that exceed even these guidelines by requiring the biologic be administered for a specific diagnosis approved by the FDA in order to provide coverage. Simply put, there is no such requirement and the ALJ did not have the authority to craft new conditions or prerequisites for Medicare coverage." (citing 42 U.S.C. § 1395hh(a)(2))); *id.* at 222 ("[T]he substantive standard applied by [the MAC] (and by extension the ALJ) is a material change in the prerequisites for coverage or payment for services and must be preceded by notice and comment pursuant to Section 1395hh(a)(2) of the Medicare Statute and the Supreme Court opinion in *Azar v. Allina Health Services*."). But that is not the same as the argument they make now that MACs continued *sub silentio* to apply the automatic-denial policy of the rescinded TDLs.

Plaintiffs also fixate on the notion that Defendants' exhaustion argument fails because the Medicare Appeals Council did not act within the time periods mandated by regulation. *See* Pls.' Opp'n at 2–3. That is inapposite. That inaction may have permitted Plaintiffs to seek judicial

review of their exhausted claims.  But it did not permit the same for the claims not channeled through the Medicare appeals process.

As Defendants point out, Plaintiffs "fail to rebut the relevant point that they never raised the specific argument that the denials were improperly based on an alleged blanket policy." Defs.' Reply at 2.  Because Plaintiffs have not exhausted their claim that CMS continued to covertly apply the automatic-denial policy of the now-rescinded TDLs to deny reimbursement claims for Ascent, the court does not have jurisdiction to adjudicate it.

### 2.    *Macomb and Corplex P*

That leaves the 15 reimbursement denials.  Here, there is no dispute that the ALJs' denials constitute final agency action and that the court has jurisdiction to hear Plaintiffs' challenges to the 15 reimbursement denials as arbitrary and capricious and unsupported by substantial evidence under the APA.  *See* Defs.' Mot. at 2; Pls.' Mot. at 3; *see also* 42 C.F.R. § 405.1048 (2017).  The court agrees that it has jurisdiction to review those denials.  But none of those 15 involve Macomb or Corplex P.  *See generally* J.A.  At the time Greiner's, Steindler's, and APC's exhausted claims became ripe for judicial review, Macomb's claims were still before an ALJ.  *See* Am. Compl. ¶¶ 3, 29.  Macomb appears to have filed a new lawsuit after the Medicare Appeals Council granted its request to escalate the claims to federal court.  *See* Compl., *Macomb Foot, Ankle & Wound Care v. Kennedy*, No. 24-cv-869 (D.D.C.), ECF No. 1.  That lawsuit is also before this court.  But because there is no final agency decision relating to Macomb or Corplex P in the administrative record to review in this matter, the court does not have jurisdiction to resolve such claims here.

### 3.    *Other Jurisdictional Bases*

Finally, although Plaintiffs asserted as bases for jurisdiction in their Complaint the Mandamus Act and the All Writs Act, *see* Am. Compl. ¶¶ 15, 186–197, they appear on summary

judgment to have abandoned these bases. *See* Defs.' Mot. at 19. Because of the high bar and discretion given to courts to grant relief on mandamus jurisdiction, *Kerr v. U.S. Dist. Ct. for N. Dist. of Cal.*, 426 U.S. 394, 402 (1976); *Am. Hosp. Ass'n v. Burwell*, 812 F.3d 183, 189 (D.C. Cir. 2016), and because Plaintiffs have not met their burden to establish such jurisdiction, the court holds that no such jurisdiction exists for any relief sought. *See also Row 1*, 92 F.4th at 1149 (denying mandamus jurisdiction).

## C.    Final Decisions

Having established that the court has jurisdiction only as to the 15 final decisions denying Plaintiffs' claims for Medicare reimbursement for their use of Ascent, the court now turns to whether those decisions were arbitrary and capricious and unsupported by substantial evidence in violation of the APA. The court holds they are not.[3]

### 1.    ALJs' Determinations

The court first lays out in summary fashion the ALJs' reasons for denying Plaintiffs' claims. All of these determinations involved application of the MPIM's criteria for a "reasonable and necessary" service covered by Medicare. *See* MPIM § 3.6.2.2.

Greiner's 10 claims were adjudicated by three different ALJs. ALJ Szymczak denied four claims largely because he determined that Plaintiffs had not "provided material evidence that went to the direct issue in the instant appeal, which is whether this biological is safe and effective for the treatment of chronic pain and/or tendonitis, or similar diagnoses of the joint." J.A. at 47, 100,

---

[3] The court did not consider the various exhibits and Statement of Material Facts filed by Plaintiffs as part of their Motion for Summary Judgment. *See generally* Pls.' Mot. Although the court may sometimes consider extra-record evidence, *see United Student Aid Funds*, 237 F. Supp. 3d at 3–4, there is no reason to do so here. Plaintiffs argue that the court should because they "not only seek[] judicial review of final agency decisions based on the administrative record, but also seek[] additional relief beyond the scope of review of individual Medicare claims." Pls.' Opp'n at 2 n.1. But because the court only has jurisdiction to review the 15 final decisions, there is no occasion to consider the extra-record evidence.

133, 175.  He determined that Greiner had selectively interpreted the Medicare Benefit Policy Manual's ("MBPM") criteria regarding Medicare coverage for drugs and biologicals and that there was "simply no convincing showing from the materials submitted that the use of [Ascent] for joint pain was an acceptable form of treatment."  *Id.*  He also found that there was evidence as to "warnings about the use of amniotic fluid in the treatment of joint pain" and that joint pain was not an indicated use.  *Id.*

ALJ Burke denied two of Greiner's claims because the use of Ascent in those cases was "experimental/investigational."  *Id.* at 213–14, 255–56.  He acknowledged that the treatment may have been effective for the beneficiaries' ailments.  But he nonetheless found that the use was experimental and investigational by relying on the lack of CMS guidance as to the use of Ascent for joint pain (compared to existing LCDs and articles as to the use of Ascent for wound care); the FDA consumer alert published on July 22, 2020; and a CMS guidance document from August 10, 2021, indicating that "[t]he use of amniotic tissue products for the treatment of pain would be considered off-label and not covered by original Medicare."  *Id.*

Finally, ALJ Donachy denied four of Greiner's claims because Greiner failed to establish that its use of Ascent was safe and effective and not experimental or investigational.  *Id.* at 429–31, 480–82, 526–28, 557–59.  She responded to Greiner's arguments in detail, writing that Greiner "conflates a drug or biological's regulatory classification with the FDA with Medicare's coverage criteria"; use of Ascent for off-label treatment of osteoarthritis was not in any major drug compendia; the two studies Greiner had submitted in support of its claims were inadequate; and application of the "reasonable and necessary" criteria did not amount to a substantive change in law requiring notice-and-comment rulemaking.  *Id.*

ALJ Nestler denied Steindler's four claims because the use of Ascent was not homologous and therefore experimental and investigational. *Id.* at 289–90, 323–24, 357–58, 393–94. She determined that use for osteoarthritis and tendinitis was not a homologous use because "Ascent was used to perform a function fundamentally distinct in the recipient beneficiary from that performed in the donor." *Id.*

Lastly, ALJ McClelland denied APC's claim seeking reimbursement for the use of Ascent for 10 beneficiaries. *Id.* at 633–35. Noting that APC's "reliance on Ascent's categorization as an FDA regulated 361 HCT/P product is misplaced and not dispositive in determining Medicare coverage and payment for Ascent injections," he found that proof of Section 361 registration alone did not suffice as evidence that the uses were safe and effective or not experimental and investigational. *Id.* He went further to say that "the record also lacks clinical and scientific support concerning the safety and effectiveness of Ascent as derived from definitive randomized clinical trials, and that Ascent is accepted by the general medical community for treating pain (or other conditions) associated with osteoarthrosis/osteoarthritis in the shoulders, hips, and knees." *Id.*

### 2.    Arbitrary and Capricious Review

Plaintiffs argue these decisions are arbitrary and capricious for three main reasons: that the ALJs (1) incorrectly applied standards applicable to Section 351 products; (2) relied on publications that were not applicable to the uses of Ascent at issue; and (3) disregarded practitioners' testimony supporting their argument that the uses of Ascent were "reasonable and necessary" and therefore reimbursable.[4]    Pls.' Mot. at 37.    And peppered throughout is the

---

[4] Plaintiffs also argue for the first time in a responsive brief that the ALJs were wrong in their application of the no-fault criteria to find Plaintiffs liable for the reimbursement denials. *See* Pls.' Opp'n at 14 n.7. The court does not consider this argument. "It is well established that an argument first presented in a reply brief before the district court is forfeited." *In re Sealed Case*, 77 F.4th 815, 829 (D.C. Cir. 2023).

contention that seemingly any application of the "reasonable and necessary" criteria constituted a substantive change in law.  Pls.' Mot. at 40.  The court takes each in turn.

*Section 351 criteria.*  Plaintiffs' primary refrain is that the Secretary incorrectly applied Section 351 standards to Section 361 products.  Their argument goes like this:  Ascent is regulated under Section 361.  Section 361 products, unlike Section 351 products, do not require FDA pre-market review and approval and therefore are not subject to regulations requiring clinical trial data or specific indications for use.  The ALJs' reliance on a lack of specific indication for use or reliable clinical trial data, therefore, is an erroneous application of Section 351 standards to Ascent, a Section 361 product.  Pls.' Mot. at 19, 38, 40.

As one ALJ observed, Plaintiffs "conflate[] a drug or biological's regulatory classification with the FDA with Medicare's coverage criteria."  J.A. at 429.  Plaintiffs themselves point out that FDA "decisions are not dispositive of Medicare coverage or reimbursement."  Pls.' Mot. at 8–9 (citing *Buckman Co. v. Pls.' Legal Comm.*, 531 U.S. 341, 350 (2001)).  The relevant regulations explicitly spell out the distinction between FDA approval and Medicare coverage:

> Both CMS and the FDA review scientific evidence, and may review the same evidence, to make purchasing and regulatory decisions, respectively.  However, CMS and its contractors make coverage determinations and the FDA conducts premarket review of products under different statutory standards and different delegated authority.  Whereas the FDA must determine that a product is safe and effective as a condition of approval, CMS must determine that the product is reasonable and necessary as a condition of [Medicare] coverage.

Medicare Program; Revised Process for Making Medicare National Coverage Determinations, 68 Fed. Reg. 55634, 55636 (Sept. 26, 2003) (internal citation omitted).  So, a product that satisfies the relevant requirements for use or sale under the FDA may nonetheless be ineligible for reimbursement by Medicare.  *See United States ex rel. Nargol v. DePuy Orthopaedics, Inc.*, 865 F.3d 29, 35 (1st Cir. 2017) ("[I]t is possible that a particular attribute of a product would not

be required to secure FDA approval, yet it would be necessary to secure reimbursement."); *Kort*, 209 F. Supp. 3d at 104 ("FDA approval of a drug does not automatically entitle it to coverage under Medicare.").

The ALJs therefore acted well within their discretion to consider the lack of a specific indication for use or of adequate clinical trial data for purposes of determining whether a particular use of Ascent was "reasonable and necessary," regardless of whether such data was required by the FDA. To the extent the ALJs must "examine the relevant data and articulate a satisfactory explanation for its action," *Fox*, 556 U.S. at 513, the ALJs have properly considered and explained the *lack* of data as a basis for their decision to deny reimbursement.

What's more, the FDA has itself disclaimed any "determination that an establishment is in compliance with applicable rules and regulations or that the HCT/P is licensed or approved by the FDA" by virtue of having registered a product as a Section 361 product. J.A. at 634. If FDA approval is not alone sufficient for Medicare coverage, then surely something less than approval is not either. *See Almy v. Sebelius*, 679 F.3d 297, 307–09 (4th Cir. 2012) (holding that requiring more than mere FDA approval where the approval process was "abbreviated" to establish that a product was safe and effective and not experimental or investigational was not arbitrary and capricious). StimLabs may have registered Ascent as required by Section 361, but this does not amount to approval by the FDA, let alone establish its use as "reasonable and necessary."

The ALJs explained that Plaintiffs' affirmative evidence was also insufficient. One study was not relevant to Ascent at all and suffered from limitations in quality. J.A. at 430. Another, performed by StimLabs, was not peer reviewed and published and was unreliable because it did not include a control group or control for the placebo effect or bias and used a small sample size. *Id.* Plaintiffs do not dispute these characterizations.

Contrary to Plaintiffs' contention then, the ALJs did not erroneously apply Section 351 criteria; rather, they simply applied the MPIM criteria to determine, as statutorily required, whether each use of Ascent was "reasonable and necessary."

*Evidence considered.*  Plaintiffs object to the ALJs' reliance on the FDA consumer alert published on July 22, 2020, warning consumers about regenerative medicine products, arguing the consumer alert is "neither a substantive [n]or interpretive rule" and "completely irrelevant to a product like Ascent" because Ascent is not a "stem cell or exosome product[]."  Pls.' Mot. at 39. This contention is flawed for two reasons.

First, the fact that the consumer alert is "neither a substantive [n]or interpretive rule" is of no moment.  ALJs can consider a host of evidence, including studies, hearing testimony, and patient records—all things Plaintiffs themselves offered to the ALJs for consideration.

Second, Plaintiffs' representation that the alert is "completely irrelevant to a product like Ascent" is plainly inaccurate.  The consumer alert covered stem cell and exosome products in addition to "products derived from . . . amniotic fluid"—of which Ascent is one.  *See* July 2020 Consumer Alert.  And it specifically highlights that no such products "have been approved for the treatment of any orthopedic condition, such as osteoarthritis, tendonitis, disc disease, tennis elbow, back pain, hip pain, knee pain, neck pain, or shoulder pain."  *Id.*  Plaintiffs expend considerable effort to distinguish Ascent from exosome products to position it as falling outside the scope of the FDA's concerns.  *See, e.g.*, Pls.' Mot. at 2, 6–7, 12, 19, 39.  Yet the alert is exactly on point to the uses at issue—the use of a product derived from amniotic fluid for the treatment of orthopedic conditions.  Relying in part on this consumer alert to deny coverage therefore demonstrates a

"rational connection between the facts found and the choice made." *See State Farm*, 463 U.S. at 43.[5]

*Practitioners' testimony.*     Plaintiffs also argue that the final decisions "ignored the testimony of the practitioners demonstrating that the Ascent injections were reasonable and necessary and used for their homologous use in compliance with the applicable Section 361 regulations." Pls.' Mot. at 37.  Plaintiffs do not say much more on this point.  But the record shows that the ALJs did consider this evidence but ultimately disagreed with it.  *See, e.g.*, J.A. at 211–13, 297, 430, 481, 527, 557–58.  It is the Secretary, not the providing physician, who weighs the evidence and makes the ultimate determination as to Medicare coverage.  *See Friedrich v. Sec'y of Health & Hum. Servs.*, 894 F.2d 829, 838 (6th Cir. 1990) ("The only legitimate claim of entitlement under Medicare is to those services that are reasonable and necessary.  There is no legitimate claim of entitlement to a given medical procedure just because a doctor prescribes it or a patient requests it." (citation omitted)).  And "a court is not to substitute its judgment for that of the agency."  *State Farm*, 463 U.S. at 43; *see also* 42 U.S.C. § 405(g) (Secretary's factual findings "if supported by substantial evidence, shall be conclusive.").

*Substantive change in law.*  Finally, Plaintiffs appear to characterize any application of the "reasonable and necessary" criteria as a substantive change in law requiring notice-and-comment rulemaking.  For instance, they argue that "requiring clinical trials," which are not required by the FDA for Section 361 products, for purposes of a Medicare determination is an application of "a

---

[5] Plaintiffs also object to one ALJ's reference to a CMS guidance document from August 2021, which post-dates the dates of service of the claims at issue. Pls.' Mot. at 41.  They argue that the August 2021 guidance document's reliance on the July 2020 consumer alert "further shows the application of a new substantive standard that was never adopted through notice and comment rulemaking."  *Id.*  Plaintiffs appear to suspect that the July 2020 consumer alert's irrelevance to Ascent signals the continued application of the automatic-denial policy in the rescinded TDLs.  *See id.* at 39, 41.  The court cannot consider Plaintiffs' covert-policy claim, *see supra* Sections IV.A.2, B.1, so it does not address this objection.  But as discussed above, the July 2020 consumer alert is directly relevant to assessing the reasonableness and need of using Ascent to treat orthopedic conditions.

new substantive standard that was never adopted through notice and comment rulemaking." Pls.' Mot. at 40. As already discussed, the ALJs were permitted under current MPIM standards to consider the lack of clinical trials to determine whether a specific use of Ascent was safe and effective and not experimental or investigational.

Plaintiffs argue the same about some ALJs' reference to the MBPM chapter on drugs and biologicals. Plaintiffs read those references "as imposing the requirements in Section 351 of the [Public Health Service] Act on HCT/Ps, including a prescription for an indicated use, or proof of acceptance for additional uses on the same basis as a drug or biologic" and assert that such an "attempt to expand the scope of this interpretive rule plainly crosses the line between interpretations and creating a substantive rule without complying with Section 1395hh." *Id.* But once again, the ALJs were not erroneously imposing Section 351 requirements on Section 361 products. They were simply applying the Medicare coverage criteria to determine whether a use was "reasonable and necessary." *See* J.A. at 431 ("[T]here has been no change in Medicare's standard when reviewing claims for Ascent or amniotic allograft generally. The fact that Medicare previously paid for Ascent for different beneficiaries under different factual circumstances, or previously erroneously paid claims in contravention of Medicare coverage criteria, does not amount to a change in a substantive legal standard.").[6]

---

[6] Plaintiffs repeatedly stress in their briefs that Ascent is an HCT/P, which is categorically distinct from a drug or biological. *See, e.g.*, Pls.' Mot. at 6 n.3 ("HCT/Ps are distinct from drugs and biologicals . . . ."); *id.* at 19, 38. Yet during the administrative appeals process, they affirmatively characterized Ascent as a biological and pointed to the same MBPM chapter on drugs and biologicals—that they now seem to repudiate—as the relevant criteria. *See* J.A. at 674 ("Ascent is an amniotic fluid allograft that is a biologic . . . ."); *see also, e.g., id.* at 1, 5, 28, 61, 72, 296–97, 672. If Plaintiffs now categorically challenge any reference to the MBPM criteria relevant to drugs and biologicals, the court does not have jurisdiction over such a claim, as this position differs from the one exhausted in the administrative appeals process. *Compare, e.g.*, J.A. at 296–97 ("[The MBPM chapter on drugs and biologicals] provide[s] guidelines for determining whether a biologic is reasonable and necessary. . . . Ascent met the guidelines for biologics . . . ."), *with* Pls.' Mot. at 40 ("This is inapposite, as [the MBPM chapter] refers to drugs and biologicals, not to HCT/Ps.").

3.    *Substantial Evidence Review*

For all the same reasons discussed above, the court finds that the Secretary's final determinations were not "unsupported by substantial evidence."  *See ADAPSO*, 745 F.2d at 684; *cf. Ctr. for Auto Safety v. Fed. Highway Admin.*, 956 F.2d 309, 314 (D.C. Cir. 1992) ("An agency action is arbitrary and capricious if it rests upon a factual premise that is unsupported by substantial evidence." (citing *ADAPSO*, 745 F.2d at 683–84)).  The court does not need to repeat all that evidence here.  It suffices to say that the ALJs relied on proper sources of proof (or the lack thereof) and there was substantial evidence to support their determinations.

Plaintiffs make one additional point on substantial evidence:  With respect to the decisions on Steindler's claims that found that the use of Ascent was not homologous, Plaintiffs argue again that this "improperly applies the criteria in Section 351 . . . to an HCT/P regulated under Section 361" and also that it "fundamentally misconstrues the FDA's authority under 21 C.F.R. Part 1271." Pls.' Mot. at 40.  The court has already rejected the former argument.  As to the latter, Plaintiffs argue that the ALJ's determination as to whether a use was homologous is outside the scope of her review because "[t]he determination as to what constitutes homologous use is expressly delegated to the FDA." *Id.*  "Absent a finding by the FDA that the product is not intended for homologous use," Plaintiffs contend, "there is no substantial evidence to support the ALJs' Decisions that the use of Ascent was not homologous." *Id.* at 40–41.

Plaintiffs cite no authority to support the proposition that a determination as to homologous use has been "expressly delegated" to the FDA.  The FDA relies on manufacturers to determine for themselves whether an HCT/P is *intended* for homologous use to register as a Section 361 product.  *See* 12 C.F.R. Part 1271.  But that does not give the FDA authority to determine whether

a particular use of a product—even one regulated under Section 361—was *in fact* homologous for purposes of Medicare coverage.

The ALJ's conclusion as to homologous use is supported by substantial evidence. It drew on examples provided in an FDA guidance published in July 2020 for industry and staff that specifically explained what would constitute homologous use and ultimately determined that, despite Steindler's attempts "to place its use of Ascent into the realm of homologous uses, it has not demonstrated the same." *See* J.A. at 289. At most, Plaintiffs have only shown that Ascent is *intended* for homologous use as required to register it as a Section 361 product. And, in any event, regulation under Section 361 has no bearing on Medicare coverage. *See supra* Section IV.C.2.

Plaintiffs do not dispute that it was reasonable for the ALJ to determine that a non-homologous use supports a finding that the use was experimental or investigational. Thus, a "reasonable mind" could apply the evidence in the record, including the FDA guidance, to "support a conclusion" that the use of Ascent was not homologous, experimental and investigational, and therefore not reasonable and necessary. *Consolo*, 383 U.S. at 619–20.[7]

## V.    CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for Summary Judgment and Declarative Relief, ECF No. 26, is denied, and Defendants' Cross-Motion for Summary Judgment, ECF No. 29, is granted. A final, appealable order accompanies this Memorandum Opinion.

Dated:  January 8, 2026

Amit P. Mehta
United States District Judge

---

[7] Plaintiffs elsewhere in their brief argue that the "ALJs erroneously . . . failed to consider or apply the applicable homologous use criteria that are applicable to Section 361 products." Pls.' Mot. at 38. Plaintiffs cannot have it both ways.